# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | CV 14-5726-GW(ASx) | | Date | August 28, 2014 |
|---|---|---|---|---|
| Title | *Spark Industries, LLC v. Kretek International, Inc., et al.* | | | |

Present: The Honorable   GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Amnon Z. Siegel | Jonathan Steinsapir |
| Justin Brownstone | Katherine Kleindienst |
| | Michael J. Kump |

**PROCEEDINGS:** **PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [26]**

Court hears oral argument. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. Plaintiff's motion is DENIED.

| | : | 25 |
|---|---|---|

Initials of Preparer   JG

*Spark Industries, LLC v. Kretek International, Inc., et al.*; Case No. 14-CV-5726-GW(ASx)
Tentative Ruling on Motion for Preliminary Injunction

      In June 2014, Plaintiff Spark Industries, LLC ("Spark") filed suit in state court against Defendants Kretek International, Inc. ("Kretek") and Mark Cassar ("Cassar") (collectively, "Defendants") asserting various claims arising from the parties' business relationship. *See* Docket No. 1-1. On July 18, 2014, Spark amended its complaint to add a trade dress infringement claim, alleging, in essence, that Kretek copied the trade dress for one of Spark's best-selling electronic cigarette products. *See* First Amended Complaint ("FAC"), Docket No. 1-4. Defendants removed the action to this Court on July 23, 2014. *See* Docket No. 1. The next day, Spark applied *ex parte* for a Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction. Docket Nos. 10, 10-17. The Court denied the TRO Application, but set an expedited preliminary injunction hearing and invited further briefing. Docket Nos. 24-25. That briefing is now before the Court. *See* Docket Nos. 26, 36, 43. For the reasons discussed below, the Court would DENY Spark's request for a preliminary injunction.

## I. Background

      Spark developed the Cig2O e-cigarette brand in 2009. Thompson Decl., Docket No. 28, ¶ 2. In 2010, Spark and Kretek entered into a business relationship. *Id.* ¶ 6. The parties disagree on the relationship's precise legal characterization – Spark contends that it was a distribution deal, while Kretek characterizes it as a general partnership. *See* Motion for Preliminary Injunction ("Mot."), Docket No. 26, at 19:13-20:12; Opposition to Motion for Preliminary Injunction ("Opp."), Docket No. 36, at 20:13-21:9. However defined, Spark and Kretek worked together to sell Cig2O products without major incident between November 2010 and August 2012. *See* Thompson Decl. ¶¶ 6-25; Gormley Decl, Docket No. 37, ¶¶ 3, 11. In August 2012, Spark discovered that Kretek was selling its own competing brand of e-cigarette, EZ Cig. Thompson Decl. ¶ 27. While EZ Cig sold competing goods, at the time, the goods used a red-and-black color scheme with different graphics. J. White Decl., Docket No. 33, ¶ 5; Sachs Decl., Docket No. 32, ¶ 11; Blankenship Decl., Docket No. 29, ¶ 6.



      Over the next two years, the Spark-Kretek relationship deteriorated further. Finally, in June 2014, Spark filed the instant lawsuit against Defendants, contending that Defendants defrauded Spark and breached the parties' exclusive distribution arrangement by selling competing EZ Cig

products. *Id.* ¶ 32; *see also* Docket No. 1-1 ¶ 2 ("Kretek's agreement not to sell competing brands of e-cigarettes was the crux of the parties' agreement. But Defendants had no intention of upholding their promise. Defendants told Spark what it wanted to hear in order to get the deal done.").

According to Spark, shortly after it filed suit, Kretek revived a previously-discontinued line of 3-pack cartomizer[1] refills and revamped the packaging so that it looked similar to Spark's Cig2O 3-pack cartomizer refills. *E.g.,* Blankenship Decl. ¶¶ 6-7; Milinkovich Decl., Docket No. 31 ¶¶ 5-6.

  

Spark believes EZ Cig's new 3-pack cartomizer refill packaging infringes the packaging trade dress for its Cig2O 3-pack cartomizer refill products. *See* FAC ¶¶ 10-13, 40-52; *see also generally* Mot.; Reply, Docket No. 43. According to Spark, it will suffer irreparable harm absent a preliminary injunction because EZ Cig products are inferior and, if confused with Spark's products, would hurt Spark's reputation. *See* Mot. at 20:14-21:22. In addition, Spark contends that Kretek's EZ Cig product line will erode the prices it can charge for its premium cartomizer products. *Id.* at 22:2-23:2.

While Kretek only recently started taking orders for its new EZ Cig 3-pack cartomizer refills, it has already executed purchase orders for the goods, and projects it will sell roughly $500,000 in 3-pack cartomizer refills in the near future. Gormley Decl. ¶ 23. Along with financial losses, Kretek contends it will suffer reputational harm if it has to cancel sales due to a preliminary injunction. *Id.*

## II. Legal Standard

Under Rule 65, courts may grant a preliminary injunction in order to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). The party seeking such relief must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities in its favor; and (4) the injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Alternatively, if the plaintiff "shows that there is a likelihood of irreparable injury and that the injunction is in the public interest," it may demonstrate its right to a preliminary injunction by establishing "serious questions going to the merits and a balance of hardships that tips sharply [in its favor]." *Farris v. Seabrook,* 677 F.3d 858, 864 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011)). Because a "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren,* 553 U.S. 674, 676 (2008) (quotations omitted), the party seeking the injunction must present

---

[1] An e-cigarette contains two parts: a permanent portion that contains the battery and heating device; and a detachable and replaceable cartridge (aka "cartomizer"), which contains the nicotine. Thompson Decl. ¶ 28.

evidence sufficient to clearly carry his burden of persuasion on each requirement. *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (citations omitted); *Winter*, 555 U.S. at 22 (explaining that an preliminary injunction can issue only on "a clear showing that the plaintiff is entitled to such relief").

## III. Analysis
### A. *Likelihood of Success on the Merits*

"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001) (citing and quoting *Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 613 (9th Cir. 1989)) (punctuation altered). "Trade dress protection is broader in scope than trademark protection, both because it protects aspects of packaging and product design that cannot be registered for trademark protection and because evaluation of trade dress infringement claims requires the court to focus on the plaintiff's entire selling image, rather than the narrower single facet of trademark." *Vision Sports, Inc.*, 888 F.2d at 613. While a plaintiff can define its trade dress as "less than the totality of features appearing on a package or container," 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 2010) § 8:1, at 8-3, in most cases, trade dress refers to a product's entire "tout ensemble," *id.* § 8.2 (quoting *Chun King Sales, Inc. v. Oriental Foods*, 136 F.Supp. 659, 664 (S.D. Cal. 1955) *aff'd but rev'd in part on other grounds sub nom. Oriental Foods, Inc. v. Chun King Sales, Inc.*, 244 F.2d 909 (9th Cir. 1957)); *Clicks Billiards*, 251 F.3d at 1259 ("Trade dress is the composite tapestry of visual effects").

To prevail on a trade dress infringement claim, the plaintiff must show (1) that its trade dress is protectable and (2) that the defendant's use of a purportedly-similar trade dress is likely to confuse consumers. *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 841 (9th Cir. 1987) ("A plaintiff seeking to recover for trade dress infringement under section 43(a) must show that its trade dress is protectable and that defendant's use of the same or similar trade dress is likely to confuse consumers"). For unregistered trade dress, protectability is demonstrated by showing that the trade dress is both (i) non-functional and (ii) performs a source-identifying role, either because the trade dress is inherently distinctive or because it has acquired distinctiveness through secondary meaning among the relevant consuming population. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992) (describing basic requirements for trade dress protection); 15 U.S.C. § 1125(a)(3) ("In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional"). Taken together then, a plaintiff asserting trade dress infringement must show "(1) that its claimed dress is nonfunctional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendant's product or service creates a likelihood of consumer confusion." *Clicks Billiards, Inc.*, 251 F.3d at 1258; *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009); *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 823 (9th Cir. 1993).

### 1. What is the Alleged Cig2O Trade Dress?

Before addressing these requirements, it is important to first define what, exactly, Spark

claims it owns.[2] Though Spark speaks in terms of "overall appearance," it also defines its trade dress for the Cig2O cartomizer packaging as consisting of the following specific elements:

> (a) Use of a blue and white color theme, with a smoky/textured blue area at the top with white text and a textured white area in the middle with blue text;
>
> (b) Use of "3 Refill Cartomizers" on refill packs in blue, sans-serif font across the middle of the package;
>
> (c) Use of different, "highlight" colors to signal the particular flavor of tobacco;
>
> (d) Use of terms such as "red tobacco" for red-colored packets and "gold tobacco" for gold-colored ones;
>
> (e) A corresponding blue area at the bottom of the package with additional lettering in white;
>
> (f) Placement of items on the package, including: the particular number (3) of the refill cartridges in the middle of the package and the brand name at top;
>
> (g) The shape, design, color scheme and graphic layout of the display carton box, including the color scheme, style, coloring and placement of text.

Mot. at 3:26-4:14. When discussing the Cig2O "trade dress," then, the Court refers to the total image and appearance created by these constituent parts.

## 2. Is the Cig2O Trade Dress Non-Functional?

In general terms, a product feature is functional if it is "essential to the use or purpose of the article or if it affects the cost or quality of the article, that is, if exclusive use of the feature would put competitors at a significant, non-reputation-related disadvantage." *Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 165 (1995); *First Brands Corp. v. Fred Meyer, Inc.*, 809 F.2d 1378, 1381 (9th Cir. 1987). "In determining functionality, a product's trade dress must be analyzed as a whole." *First Brands Corp.*, 809 F.2d at 1381. A product's functional features are those features "'which constitute the actual benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product.'" *Rachel v. Banana Republic, Inc.*, 831 F.2d 1503, 1506 (9th Cir. 1987) (quoting *Vuitton Et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 774 (9th Cir. 1981) (citations and quotations omitted)). "The fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be

---

[2]*See Indonesian Imports, Inc. v. Old Navy, Inc.*, No. 98-CV-2401-FMS, 1999 U.S. Dist. LEXIS 3975, at *10 (N.D. Cal. Mar. 29, 1999) ("Without a clear statement of the claimed trade dress, the Court can neither determine whether the claimed trade dress is valid nor appropriately tailor any necessary injunctive relief") (citing *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2nd Cir. 1997) ("[F]ocus on the overall look of a product does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are," and will also "be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection.")); McCarthy § 8:3, at 8-11-14 ("[I]t will not do to solely identify in litigation such a combination as 'the trade dress.' Rather, the discrete elements which make up that combination should be separated out and identified in a list. Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.") (citations omitted).

protected together as part of a trade dress." *Clicks Billiards, Inc.*, 251 F.3d at 1259; *Int'l Jensen, Inc.*, 4 F.3d at 823 ("In determining functionality, a product's trade dress must be analyzed as a whole. Our inquiry is not directed at whether the individual elements are functional but whether the whole collection of elements taken together are functional.") (citations and quotations omitted).

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co.*, 514 U.S. at 164. In other words, the functionality doctrine seeks to ensure that one competitor does not lock up the cheapest and most effective way of making or selling a product with perpetual, patent-like protection. *See Leatherman Tool Grp., Inc. v. Cooper Indus., Inc.*, 199 F.3d 1009, 1011-12 (9th Cir. 1999) ("The [nonfunctionality requirement] is based on the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws") (citations and quotations omitted). Given the functionality doctrine's underlying purpose, the Ninth Circuit has suggested that it may apply with somewhat less force in most product packaging cases, as opposed to cases involving product configurations. *See Clicks Billiards, Inc.*, 251 F.3d at 1261 (explaining that a "wide range of available packaging and design options allows a producer to appropriate a distinctive identity without unduly hindering his competitors' ability to compete," and concluding that pool hall's trade dress was non-functional, despite the presence of several functional features, because the "particular integration of elements leaves a multitude of alternatives to the pool hall industry that would not prove confusingly similar to its trade dress"); *Leatherman Tool Grp., Inc.*, 199 F.3d at 1013 & n.6 ("As a practical matter . . . it may often be difficult to show that the configuration of a useful product is not functional. As the issue would be less likely to arise with product packaging, and could not arise with respect to a trademark, it is fair to say that it may be more difficult to establish protectable rights in product configuration cases, even assuming the legal concepts and standards otherwise are no different.") (citations omitted).

In determining whether a claimed trade dress is functional, courts commonly consider four factors: "(1) whether the design yields a utilitarian advantage, (2) whether alternative designs are available, (3) whether advertising touts the utilitarian advantages of the design, and (4) whether the particular design results from a comparatively simple or inexpensive method of manufacture." *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.*, 158 F.3d 1002, 1006 (9th Cir. 1998). While the so-called "*Disc Golf* factors" appear better suited to product configuration cases, courts have often applied them in product packaging cases to help determine whether the claimed packaging trade dress is functional or not. *E.g., Fiji Water Co., LLC v. Fiji Mineral Water USA, LLC*, 741 F.Supp.2d 1165, 1172 (C.D. Cal. 2010) (applying factors to product packaging trade dress); *CytoSport, Inc. v. Vital Pharm., Inc.*, 617 F.Supp.2d 1051, 1078 (E.D. Cal. 2009) *aff'd,* 348 F.Appx. 288 (9th Cir. 2009); *see also Int'l Jensen, Inc.*, 4 F.3d at 823 (applying similar factors in product packaging case).

Turning these standards to this case's facts, the Court would conclude that the Cig2O trade dress, taken as a whole, is likely not functional. Though reaching this conclusion, the Court agrees with Kretek that several discrete elements of the claimed trade dress appear to be functional. For example, the clear plastic display allows customers to see what is being sold. *Seirus Innovative Accessories, Inc. v. Gordini U.S.A. Inc.*, 849 F.Supp.2d 963, 987 (S.D. Cal. 2012) ("[The plaintiff's] packaging serves a utilitarian advantage because it permits the purchaser to view the product"); *Original Appalachian Artworks, Inc. v. Blue Box Factory (USA) Ltd.*, 577 F.Supp. 625, 631

(S.D.N.Y. 1983) ("The plastic front window on the boxes in which the dolls are sold is a commonly used, functional device for displaying dolls"). Phrases like "3 refill cartomizers" and the use of highlight colors – "red tobacco" or "gold tobacco" – are also functional because they tell customers what the package contains. *Avery Dennison Corp. v. Acco Brands, Inc.*, No. 99-CV-1877-DT(MCx), 1999 U.S. Dist. LEXIS 21464, at \*46 (C.D. Cal. Oct. 12, 1999) ("[F]unctional aspects of packaging include the use of generic or descriptive matter that informs the public of the nature or function of the product itself"); *CytoSport, Inc.*, 617 F.Supp.2d at 1079 (stating that "colored swirl identifying the flavor of the product" would be functional); *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 614 F.Supp. 1278, 1312 (S.D.N.Y. 1985), *aff'd in part, vacated in part on other grounds*, 781 F.2d 198 (Fed. Cir. 1986) ("Use of lime green and blue to designate lime and menthol 'flavors' constitutes a functional convention within the shave cream industry neither unique nor original to plaintiff"). In addition, the shape of the packaging is functional because it holds the product on store shelves in an easily-accessible fashion. *See, e.g., Rodan & Fields, LLC v. Estee Lauder Cos.*, No. 10-CV-2451-LHK, 2010 U.S. Dist. LEXIS 109573, at \*16 (N.D. Cal. Oct. 5, 2010) (finding packaging functional because "[t]he use of a bag with a flat bottom makes the bag capable of standing upright on shelves, while the handle at top allows the bag to hang on a display case and be carried by consumers"); *Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 604 (9th Cir. 2003) (finding bike bottle design functional, in part, because it allowed bottle to fit neatly into a bike bottle holder).

But, as the Ninth Circuit has repeatedly cautioned, it would be a mistake to pick apart the claimed trade dress and analyze each component in isolation. *Clicks Billiards, Inc.*, 251 F.3d at 1259 ("[I]n evaluating functionality as well as the other elements of a trade dress claim, it is crucial that we focus not on the individual elements, but rather on the overall visual impression that the combination and arrangement of those elements create . . . . Courts have repeatedly cautioned that, in trademark – and especially trade dress-cases, the mark must be examined as a whole, not by its individual constituent parts."). Instead, the Court must look at the packaging as a whole, with a particular focus on whether Spark's particular integration of the various elements on the Cig2O packaging leaves competitors with commercially-feasible alternatives. *Clicks Billiards, Inc.*, 251 F.3d at 1261 (explaining that the ultimate issue of functionality in packaging-type cases "is whether [the] particular integration of elements leaves a multitude of alternatives to [competitors in the] industry that would not prove confusingly similar") (quotations omitted); *Fiji Water Co., LLC*, 741 F.Supp.2d at 1174 (indicating that alternatives in packaging context weigh strongly against functionality: "[Plaintiff's] evidence [shows] that commercially feasible alternative configurations exist such that providing trademark protection to one design would not hinder competition").

Here, there is no function being served by the Cig2O trade dress's particular arrangement or several particular elements. For example, the blue and white packaging – with a smoky blue area at the top, textured white section in the middle, and smoky blue area at the bottom – serves no utilitarian function and has no impact on the function or quality of the cartomizers being sold. Likewise, the font, font size, and font color serve no utilitarian function; nor does the strategic placement of certain items of text – for instance, putting the words "3 refill cartomizers" above the clear package instead of below; including the warning in black writing in the white textured region; or choosing to add the highlight color just between the smoky blue top section and textured middle, with the flavor described in a set-aside box to the right of center. In addition, both parties have come forward with evidence of feasible alternative cartomizer packaging. *See, e.g.,* Thompson Decl., Exs.

H, J; Geoghegan Decl., Docket No. 37, Ex. 9; C. White Decl., Docket No. 37, Ex. 28; Cheng Decl., Docket No. 37, Exs. 30-31.[3]  Despite the existence of discrete functional elements, courts have repeatedly found product packaging non-functional under similar circumstances.  *See, e.g., Card Tech Int'l, LLP v. Provenzano*, No. 11-CV-2434-DSF(PLAx), 2012 U.S. Dist. LEXIS 81481, at *63-*64 (C.D. Cal. June 7, 2012) ("The overall appearance of Card Tech's website and packaging are not functional.  Providing a product name, instructions for use, depictions of the product, and how-to illustrations are arguably functional features because they yield a utilitarian advantage, and because preventing a competitor from using these features would hamper competition and put competitors at a non-reputation-related disadvantage.  However, trade dress is to be viewed as a whole.  The particular arrangement of these features, along with the colors and shapes on Card Tech's packaging, is not functional."); *Fiji Water Co., LLC*, 741 F.Supp.2d at 1174-76 ("Although FIJI does include the square bottle shape as an element of its trade dress, FIJI seeks to protect the shape of the bottle together with the aesthetic elements such as the font, the raindrop and the hibiscus flower.  Taken together, the design elements of FIJI's water bottle are purely aesthetic."); *CytoSport, Inc.*, 617 F. Supp. 2d at 1078-79 ("Although the individual design elements of plaintiff's trade dress may serve as functional elements (such as the Tetra Pak packaging and the colored swirl identifying the flavor of the product), the focus of the functionality inquiry is upon the overall visual impression that the combination and arrangement of those elements create.  Considering plaintiff's Tetra Pak RTD nutritional product in whole, the court finds that plaintiff has sufficiently shown that its product's design is non-functional."); *see also id.* at 1085 & n.2 (denying request to stay preliminary injunction where defendant continued trying to dissect individual components: "[The defendant] continues to point to individual components of the MUSCLE MILK trade dress to argue that each component serves some useful, functional purpose.  However, as the court's order made clear, while individual components of a trade dress may serve some purpose, it is the particular placement and orientation of those components on the MUSLCE MILK packaging that is protectable; in assessing functionality, it is the combination of the elements as a whole which the court must examine."); *Ruiz Food Prods. v. Camino Real Foods, Inc.*, No. 09-CV-1731-AWI(SMSx), 2009 U.S. Dist. LEXIS 105941, at *6-*7 (E.D. Cal. Oct. 29, 2009) ("While individual features may be functional (such as stating the content of the product or providing nutritional information), the overall appearance of Plaintiff's packaging is plainly not functional . . . . The possible varieties of advertising display and packaging are virtually endless [and] the plaintiff seeks only to protect the combination of particular hues of these colors, arranged in certain geometric designs, presented in conjunction with a particular style of printing, in such fashion that, taken together, they create a distinctive visual impression.  This would leave innumerable other combinations of the same colors or other colors that could be assembled in a multitude of patterns to be used with uncounted type faces.") (citations and quotations omitted); *Carol Cable Co. v. Grand Auto, Inc.*, No. 87-CV-1036-MHP, 1987 U.S. Dist. LEXIS 14232, at *9-11 (N.D. Cal. Apr. 24, 1987) ("While some of the specific aspects of the disputed trade dress are functional insofar as they depict or describe the use of the product contained within and the precautions one must take in its use, the confusing dress as a whole is clearly nonfunctional.  The confusing similarities between the two boxes are the product of graphic design, coloration, and text placement and phrasing rather than the functional information communicated

---

[3]The third and fourth *Disc Golf* factors do not tilt either way.

in the process. As defendant itself has demonstrated to the court in its submission containing examples of other companies' booster cables packaging, the functional aspects of the trade dress can be communicated in a variety of ways which are entirely distinct from plaintiff's particular packaging design.") (citations omitted). Bearing in mind that product packaging is the quintessential form of trade dress – as it "normally is taken by the consumer to indicate origin," *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 215 (2000) – the Court would conclude that Spark has shown a likelihood of success in proving non-functionality.

### 3. Does the Cig2O Trade Dress Serve a Source-Identifying Function?

A trade dress plaintiff can show that its product packaging performs a source-identifying role either because it (a) is inherently distinctive or (b) has acquired secondary meaning. *Clicks Billiards, Inc.*, 251 F.3d at 1258. Spark contends the Cig2O trade dress is both inherently distinctive and has acquired secondary meaning. Mot. at 10:15-13:20. Kretek entirely disagrees. Opp. at 7:17-11:16.

### a. Is the Cig2O Trade Dress Inherently Distinctive?

Courts typically apply the *Seabrook* test to determine whether product packaging is inherently distinctive. *See Mattel, Inc. v. MGA Entm't, Inc.*, 782 F.Supp.2d 911, 1004 (C.D. Cal. 2011); *Fiji Water Co.*, 741 F.Supp.2d at 1176; McCarthy § 8:13, at 8-58.12-14. The *Seabrook* test asks whether the claimed trade dress is "[1] a 'common' basic shape or design, [2] whether it was unique or unusual in a particular field, [or] [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods[.]" *See Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A. 1977).[4] Though phrased in a legalistic multi-part test, stripped down, the *Seabrook* test is really asking "whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin – a trademark." McCarthy § 8:13, at 8-58.12.

Here, the Court would find that Spark has not shown a likelihood of demonstrating that the Cig2O trade dress is inherently distinctive. While it is true that distinctiveness must be measured by examining the packaging as a whole, under the *Seabrook* test, courts must still ask whether the packaging is "mere refinement of a commonly-adopted and well-known form of ornamentation," with an eye towards determining whether the combination of elements of "so unique, unusual or unexpected" that the Court can presume source identification without evidence. Viewing all of the claimed elements together, it is hard to see how the Court can find inherent distinctiveness with, for example, products like 21st Century Smoke, Vapage,[5] and Vapourlites in the marketplace.

\\\
\\\
\\\
\\\

---

[4]If the claimed trade dress packaging fails any of these factors, it is not inherently distinctive. *See In re Chippendales USA, Inc.*, 622 F.3d 1346, 1355 (Fed. Cir. 2010) ("A finding that any one of these factors is satisfied may render the mark not inherently distinctive").

[5]Apparently, Spark also created the Vapage product line. Gormley Decl. ¶ 4.

  

COOL MENTHOL              555 TOBACCO

 



-9-

Like the Cig2O packaging, the 21st Century Smoke packaging combines a color theme and white text on the top and bottom bands with a textured white middle section, displaying the three cartomizers horizontally in identical clear plastic packaging; the 21st Century Smoke packaging also uses colors to identify flavors, and employs a nearly identical shape with a similar graphical layout. The Vapage packaging employs a similar blue color theme with a similar font, color-coded flavor descriptions, the same textured white middle portion, and a clear plastic cartomizer display. Vapourlites also features a smoky blue and white color theme with a clear plastic display. While it is true that the Cig2O trade dress uses a different color theme than 21st Century Smoke, a different display box than Vapage, and a different display box and graphical layout than Vapourlites, when viewed together and in conjunction with the other packaging in the market,[6] the Court does not see the Cig2O trade dress as *so* unusual or unexpected that it can presume – without evidence – the claimed trade dress performs a source identifying role.

Spark relies primarily on three district court cases to support its argument that the Cig2O trade dress is inherently distinctive because "no other competitors in the market used this same combination of elements." Mot. at 10:16-11:26 (citing *Fiji Water Co.*, 741 F.Supp.2d at 1176, *Lisa Frank, Inc. v. Impact Int'l, Inc.*, 799 F.Supp. 980, 988-89 (D. Ariz. 1992), and *Card Tech Int'l, LLP*, 2012 U.S. Dist. LEXIS 81481, at *64-*65). While each decision provides Spark with some support, the Court ultimately finds them unpersuasive. In *Fiji Water Co.*, the claimed trade dress "won international awards for print and packaging excellence and design innovation in the food packaging industry," which the court considered strong evidence to support the plaintiff's claim that the product packaging was unique or unusual in the field. 741 F.Supp.2d at 1176. Here, the variations Spark relies on to differentiate its packaging consist of a slightly different color motif, graphic layout, and choice of font – hardly components that are unusual enough to give rise to a presumption of source-identification. Reply at 7:16-17. In *Lisa Frank*, the court began by explaining that packaging trade dress containing arbitrary design features may be inherently distinctive where the arbitrary features neither assist in describing the product nor in providing effective packaging. 799 F.Supp. at 988. Turning to the stationery products in question, the court concluded that the "unique use of" "bold colors and a graduated color-fade with knock-out graphics and other artwork," which neither "serve[d] to assist in describing the product or the product's use," "create[d] a distinctive visual impression" from which source identification could be presumed. *Id.* at 988-89. Here, even including features that "assist in describing the product [and] its effective packaging" – like product shape, cartomizer display, and product descriptions – Spark is left with a fairly routine color scheme, graphic layout, and choice of font. Rather than "bold colors," "knock-out graphics," and "other artwork," if the Court were to presume source identification based on these mundane differentiating characteristics, the Court does not see what types of trade dress would *not* be inherently distinctive.[7]

---

[6] Albeit in varying combinations, other industry competitors also appear to be using many of the same composite elements. *See, e.g.,* C. White Decl., Exs. 29-30 (display cartons); Cheng Decl., Exs. 31-34 (cartomizer three-packs with clear plastic display; blue and white color themes; colors for flavors; smoky textures).

[7] The *Card Tech Int'l* decision, rendered after a bench trial, is somewhat conclusory in its assessment, but reiterates the unremarkable proposition that trade dress protection may extend to product packaging consisting of a unique "combination of elements [that] is not a mere refinement of well-known forms of ornamentation commonly used by others in the relevant industry." 2012 U.S. Dist LEXIS 81481, at *64-*65.

To some extent, Spark's argument seems to invite the Court to lose focus on the relevant question: is the claimed trade dress is so unique or unusual in the market that, without more, it can be presumed to be source identifying? But as the leading treatise and several courts have explained:

> It is erroneous to find a packaging feature to be "inherently distinctive" merely because it is not *identical* to features commonly found in the marketplace. A package feature is not inherently distinctive merely because there is no other package on the market that looks exactly the same. It would, in the author's opinion, be anti-competitive to dub as "inherently distinctive" features that differ only slightly from those commonly encountered by customers in the marketplace. For such variations on commonplace features, the party claiming exclusive rights must prove secondary meaning.

McCarthy § 8:13, at 8-58.16-17 (emphasis in original). Indeed, if a trade dress plaintiff could establish inherent distinctiveness "merely [by] combin[ing] common design elements in a particular way," that "essentially would require a finding of inherent distinctiveness whenever a new [package design] enters the market." *Avery Dennison Corp.*, 1999 U.S. Dist. LEXIS 21464, at *33-*34; *Pebble Beach Co. v. Tour*, 18 I, 155 F.3d 526, 541 n.7 (5th Cir. 1998) ("The Plaintiffs argue that their golf-hole designs are unique and therefore inherently distinctive, urging us to equate uniqueness with inherent distinctiveness. However, something that is inherently distinctive is unique, but the converse is not necessarily true. A product may be unique and yet fail to be sufficiently distinctive to indicate source."); *Buca, Inc. v. Gambucci's Inc.*, 18 F.Supp.2d 1193, 1203 (D. Kan. 1998) ("[W]e find plaintiff's evidence that no other restaurant has the precise combination of features arranged in the same excessive, irreverent manner as Buca simply does not militate a finding of inherent distinctiveness"); *Turtle Wax, Inc. v. First Brands Corp.*, 781 F.Supp. 1314, 1321 (N.D. Ill. 1991) ("[T]he Court cannot agree with Turtle Wax that a finding of inherent distinctiveness was required simply because no existing product utilized precisely the same combination of elements as plaintiff's Liquid Crystal trade dress . . . . According to Turtle Wax, this finding compelled the conclusion that the Liquid Crystal trade dress was new and unique. However, such a rule essentially would extend trade dress protection to every new compilation of elements in a particular field and would run afoul of the *Seabrook* tenet that a trade dress is not unique and distinctive if it merely refines common forms of ornamentation utilized in a particular field of goods."). *See also, e.g, Fuddruckers, Inc.*, 826 F.2d at 844 ("Fuddruckers claims trade dress protection for the impression created by a collection of common or functional elements of restaurant decor. Such an overall impression may receive protection, but it is simply not the sort of arbitrary or uncommon trade dress that might qualify as inherently distinctive."); *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 247 (5th Cir. 2010) ("The Star Symbol is thus not so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin – a trademark, and it does not almost automatically tell a customer that it refers to a brand or immediately signal a brand or a product source. Because the Star Symbol does not, by its intrinsic nature, serve to identify a particular source, it is not inherently distinctive, and it can be protected only upon a showing of secondary meaning.") (citations and quotations omitted, punctuation altered); *Lanard Toys Ltd. v. Novelty, Inc.*, No. 05-CV-8406-CAS(JJx), 2006 U.S. Dist. LEXIS 96703, at *34 (C.D. Cal. Mar. 16, 2006) ("Moreover, the Court is unpersuaded, as plaintiffs contend, that the elements of the toy packaging in which plaintiffs claim trade dress protection, including the

-11-

choice of colors, the placement of the illustrations, product name, and text on the packaging, the illustrations themselves, and the use of instructions balloons, are inherently distinctive. Specifically, the Court concludes that, insofar as plaintiffs are claiming trade dress protection for the impression created by a collection of common or functional elements of the packaging of plaintiffs' toys, plaintiffs' claimed trade dress is not the sort of arbitrary or uncommon trade dress that would qualify as inherently distinctive."). But so long as uniqueness does not automatically equate to inherent distinctiveness, the Court would find that, at this point, Spark has not demonstrated a likelihood of showing an inherently distinctive trade dress.[8]

### b. Has the Cig2O Trade Dress Acquired Secondary Meaning?

As a result, the question becomes whether Spark is likely to show that its claimed trade dress has acquired secondary meaning. Secondary meaning exists when there is "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc. (Levi Strauss II)*, 778 F.2d 1352, 1354 (9th Cir. 1985) (citations and quotations omitted). In other words, secondary meaning exists where, upon seeing the trade dress, consumers associate it with a single (albeit possibly anonymous) source. *Levi Strauss & Co. v. Blue Bell, Inc. (Levi Strauss I)*, 632 F.2d 817, 820 (9th Cir. 1980) ("The basic element of secondary meaning is a mental recognition in buyers' and potential buyers' minds that products connected with [mark] emanate from or are associated with the same source").

A plaintiff can establish secondary meaning through direct or indirect evidence. Direct evidence – like consumer surveys – provides the strongest evidence of secondary meaning. *Vision Sports, Inc.*, 888 F.2d at 615 (citing *Levi Strauss II*, 778 F.2d at 1358). But a plaintiff can also show secondary meaning through indirect evidence, including the: "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; [and its] established place in the market." *Filipino Yellow Pages, Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1151 (9th Cir. 1999); *Vision Sports, Inc.*, 888 F.2d at 615. While not rising to the level of a presumption, evidence of deliberate copying may also support an inference of secondary meaning in appropriate cases. *Fuddruckers, Inc.*, 826 F.2d at 844 ("[I]n appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning") (citations omitted).

Spark relies on four factors to support its secondary meaning argument: (1) evidence of direct copying; (2) exclusive use of the trade dress for several years; (3) amount and manner of advertising; and (4) amount of sales. On the copying issue – which both sides agree is key – the facts are these: Between 2010 and June 2014, Kretek served as the exclusive distributor of Cig2O products, including the cartomizer 3-pack at issue. *See, e.g.,* Thompson Decl. ¶¶ 6, 9, 11; Geoghegan Decl. ¶ 2; Gormley Decl. ¶ 4. In 2012, Kretek established EZ Cig, its own proprietary brand for selling cartomizer replacements (among other things). Thompson Decl. ¶ 27. While the EZ Cig product line underwent various changes over time, Cheng Decl. ¶¶ 3, 5, between August 2012 and June 2014,

---

[8]Accepting Spark's argument would logically seem to suggest that every package displayed in the parties' exhibits is not just potentially protectable – but *inherently distinctive* – since none have the exact same combination of elements. Even in a competitive field, then, each competitor's product packaging would be presumed source-identifying, without evidence, since no prior packaging contains the exact same combination of design elements. This argument – which equates *distinctiveness* with *inherent distinctiveness* – basically eliminates the source-identification requirement. The Court does not believe that this is a correct (or wise) application of the law.

EZ Cig always used a red and black color motif for its products, J. White Decl. ¶ 5; Sachs Decl. ¶ 11; Blankenship Decl. ¶ 6. In June 2014, Spark filed the instant lawsuit, contending that Defendants defrauded Spark and breached the parties' exclusive distribution agreement by selling competing EZ Cig products. *See* Thompson Decl. ¶ 32. Shortly after Spark filed suit, several members of Kretek's management team held a conference call with Kretek's sales force. Blankenship Decl. ¶ 6; Milinkovich Decl. ¶ 5. During the call, management said Kretek would be re-issuing EZ Cig's previously-discontinued line of 3-pack cartomizer refills. Blankenship Decl. ¶ 7; Milinkovich Decl. ¶ 6. Shortly after the call Kretek issued the new "Blue Label" design at issue in this case. For the first time, that design used a blue and white color motif, as opposed to EZ Cig's old black and red pattern; it also employed different graphics. Based on these facts, Spark contends that EZ Cig copied its Cig2O trade dress in order to capitalize on the trade dress's existing secondary meaning.

Spark analogizes these facts to those found in *Knorr-Nahrmittel A.G. v. Reese Finer Foods, Inc.*, 695 F.Supp. 787, 792 (D.N.J. 1988), and *Carol Cable Co.*, 1987 U.S. Dist. LEXIS 14232, at *14-*16, both of which held that unexplained proof of intentional copying provides strong support for secondary meaning. In *Knorr Nahrmittel*, the plaintiff sued a former distributor who introduced a replacement product with near-identical packaging shortly after the distribution relationship ended. *See* 695 F.Supp. at 788-90. After considering other factors, the court found that the "most telling evidence" of secondary meaning was "the simple fact of intentional copying." *Id.* at 792. Although the defendant denied intentionally copying the plaintiff's trade dress, the court reasoned that, taking "into consideration [the defendant's] former role as a distributor and its efforts to compete against the established [plaintiff] line [of products], it would be naive to suggest that [the defendant] happened upon a design that imitates in significant ways the successful [plaintiff] line." *Id.* In the court's view, the "fact of copying alone [was] sufficient to establish secondary meaning in [that] case." *Id.* at 792-93; *see also Carol Cable Co.*, 1987 U.S. Dist. LEXIS 14232, at *15 (finding that circumstantial evidence of copying was a "particularly compelling consideration" in secondary meaning analysis when "competing product [was] sold by one of [plaintiff's] prior retailers"). As the Ninth Circuit has explained, the common-sense rationale underlying these decisions is that there often "is no logical reason for . . . precise copying save an attempt to realize upon [an existing] secondary meaning." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1016 (9th Cir. 1985) (quoting *Audio Fid., Inc. v. High Fid. Recordings, Inc.*, 283 F.2d 551, 558 (9th Cir. 1960)).

Kretek does not *really* deny Spark's intentional copying charge or provide an evidentiary response,[9] but argues that "evidence of intentional copying – even if it existed, and it does not – fails to carry Spark's burden," as intentional copying only supports a finding of secondary meaning where "the defendant intended to confuse consumers and pass [off] its product as the plaintiff's." Opp. at 10:20-25, 11:7-16. On this point, Kretek argues that Spark has presented no evidence that it intended to confuse consumers. In fact, Kretek contends, its prominent use of the EZ Cig word mark on the packaging dispels any inference that it copied Spark intending to cause confusion. Opp. at 10:25-27.

The Court would find the evidence of intentional copying in this case provides some support

---

[9]Kretek argues that the evidence Spark cites to support its intentional copying charge is unreliable since it comes from "disgruntled, former Kretek employees." Opp at 10:7-19. But Kretek does not offer any declarations from its own employees rebutting the claims made by the "disgruntled employees"; nor does Kretek submit evidence that it was contemplating the accused cartomizer 3-pack packaging before June 2014. At most, Kretek's evidence indicates that it was considering some undefined re-design of undefined EZ Cig product lines. Cheng Decl. ¶¶ 8-9.

– albeit qualified and muted support – for an inference of secondary meaning. In some cases, courts have held that prominent display of defendant's mark refutes an inference that the defendant copied the plaintiff's trade dress in order to capitalize on its secondary meaning. *See, e.g., Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 871 (8th Cir. 1994) ("Because of [the defendant's] conspicuous use of its own trademarks, therefore, it was clearly erroneous to infer from [the defendant's] copying of [the plaintiff's] product that the marks at issue here had acquired secondary meaning"); *MSP Corp. v. Westech Instruments, Inc.*, 500 F.Supp.2d 1198, 1214 (D. Minn. 2007) ("While secondary meaning can be inferred from evidence of deliberate copying, courts will not infer secondary meaning when the defendant conspicuously uses its own trademark to identify the product") (citing *Aromatique*, 28 F.3d at 871). In addition, courts have held that other, non-nefarious explanations for intentional copying – like the desire to emulate a trade dress's functional elements or other non-protectable qualities – may refute an inference that the defendant was trying to capitalize on an existing (or at least perceived) secondary meaning. *See, e.g., Fuddruckers, Inc.*, 826 F.2d at 844-45 ("Competitors may intentionally copy product features for a variety of reasons. They may, for example, choose to copy wholly functional features that they perceive as lacking any secondary meaning because of those features' intrinsic economic benefits").

Here, Kretek has not offered any legitimate justification for re-initiating its 3-pack cartomizer product line – with an entirely new look (in some ways markedly) similar to Cig2O's – just after the parties' distribution relationship dissolved.[10] While Kretek's inclusion of the EZ Cig word mark in some ways mutes the inference of secondary meaning, "consider[ing] [Kretek's] former role as a distributor and its efforts to compete against [Cig2O], it would be naive to suggest that [Kretek] happened upon a design that imitates in significant ways the successful [Cig2O] line" if Kretek was not intending to capitalize on Cig2O's secondary meaning. *Knorr-Nahrmittel*, 695 F.Supp. at 792-93. While this issue is close, the Court should find that the evidence of intentional copying supports an inference – albeit a muted one – that the Cig2O trade dress has acquired secondary meaning.

Nonetheless, the Court would conclude that Spark's secondary meaning evidence, taken as a whole, does not presently support a finding in its favor. In addition to its evidence of intentional copying, Spark cites the fact that it is the 10th largest brand in the e-cigarette industry and that its Cig2O 3-pack cartomizer business makes up 60% of its $40+ million in retail sales. *See* Reply at 11:6-11. As discussed further in the footnote, the Court is not really sure what to make of these largely-unadorned numbers.[11] Spark also contends that secondary meaning can be inferred from its

---

[10]The Court recognizes that the burden of proving secondary meaning rests with Spark. Nonetheless, Kretek's failure to provide a convincing justification permits the Court to infer the copying was done, at least to some extent, in order to capitalize on Cig2O's existing or perceived secondary meaning.

[11]Spark mixes and matches a lot of numbers here in an unilluminating way. For example, Spark states that its retail sales exceed $40 million, that 60% of its sales consist of 3-pack cartomizers, and that it is the 10th largest brand "in the industry." Reply at 11:6-11. By presenting the $40 million and 60% numbers together, Spark seems to suggest that 3-pack cartomizer sales should account for something like $24 million (60% of $40 million). But this is not necessarily so. For instance, the other 40% of sales might be for goods worth three times the cost of Cig2O 3-packs. Or they could be for goods worth less. Since it is not clear, these raw numbers are not that helpful. Also, assuming the rankings data comprehensively covers a defined electronic cigarette industry, it is unclear how market share is measured – whether by volume of sales, revenue, etc. – and how this data relates to the specific product at issue – cartomizer refill packages. Maybe Spark sells more 3-pack cartomizer refills than anyone else. On the other

-14-

exclusive use of the trade dress over five years. Mot. at 4:15-16 (citing Thompson Decl. ¶ 37). As a factual matter, this is inaccurate. Spark defines its trade dress in a very specific way. *See* Section III.A.1., *supra* (discussing specific elements of Spark's trade dress). Among other things, it includes:

> Use of a blue and white color theme, with a smoky/textured blue area at the
> top with white text and a textured white area in the middle with blue text[.]

Mot. at 4:1-13. Until approximately two years ago, the packaging for the Cig2O 3-pack cartomizer refills did not have these features. *See* Geoghegan Decl. ¶¶ 5, 9 & Exs. 3, 7.




Spark tries to downplay the significance of the change, characterizing it as a "minor change in the orientation." Reply at 12 & n.6. But, no doubt, the "minor change in orientation" changes the overall look and feel of the packaging – which is what Spark contends has acquired secondary meaning. And while it is true that there is no fixed amount of time that packaging must be in circulation before it can acquire secondary meaning, *see generally* McCarthy § 15:54, at 15-90, and that courts have found secondary meaning after relatively short periods of time, as a general matter, two years of exclusive use is on the low end of the spectrum. *See, e.g., Cont'l Lab. Products, Inc. v. Medax Int'l, Inc.*, 114 F.Supp.2d 992, 1004-05 (S.D. Cal. 2000) (finding that four years of exclusive use did not support secondary meaning and collecting cases finding the same despite use for 9, 10, and 15 years). Thus, while this factor may somewhat favor a finding of secondary meaning, it does not tilt the scales much in Spark's direction.

In part, this is because Spark's advertising evidence is not particularly persuasive. Spark claims that the Cig2O trade dress has been "featured" in advertisements. Reply at 11:12-16. But even accepting this characterization as true, several courts, including the Ninth Circuit, have held that "advertising must direct the consumer to those features claimed as trade dress; merely 'featuring' the relevant aspect of the product does not suffice." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F.Supp.2d 1168, 1180 (N.D. Cal. 2007) (relying on *First Brands*, 809 F.2d at 1383).

---

hand, maybe other companies on the list only sell 3-pack cartomizer refills, so Spark's sales are relatively small. In short, based on the evidentiary presentation, the Court does not really know what to make of these numbers.

And, in any event, "[e]vidence which merely shows that a product is popular is not probative evidence of secondary meaning in the trademark for that product." McCarthy § 15:47, at 15-76-77; *see also id.* ("Popularity of a product is not synonymous with secondary meaning. Large sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark. To make popularity relevant as evidence, causation between the [trade dress] and the popularity must be proved.").

Indeed, the Ninth Circuit addressed this specific issue in *First Brands*, where it explained that, to be probative of secondary meaning:

> [A]dvertising and promotional activities must involve "image advertising," that is, the ads must feature in some way the trade dress itself. Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source.

809 F.2d at 1383.[12] For this reason, in *First Brands*, the Ninth Circuit affirmed the district court's finding that the plaintiff's advertising evidence was not probative of secondary meaning, even though the plaintiff had used the trade dress exclusively for five years, where the advertising did not stress to consumers the trade dress features:

> The district court found that [the plaintiff's] "advertising campaign has not stressed the color and shape of the antifreeze jug [i.e., the claimed trade dress,] so as to support an inference of secondary meaning." Prior to the hearing before the district court, [the plaintiff] did not attempt to engender consumer identification with the yellow, F-style jug. It did not, for example, urge consumers to look for the "familiar yellow jug." The district court's finding that [the plaintiff's] extensive advertising budget failed to establish a secondary meaning is not clearly erroneous.

*Id.* Courts have repeatedly followed *First Brands* in concluding that advertising is not probative of secondary meaning – or, at most, minimally probative – where it does not highlight the claimed trade dress features. *See, e.g., Walker & Zanger, Inc.*, 549 F.Supp.2d at 1180; *San Francisco Mercantile Co., Inc. v. Beeba's Creations, Inc.*, 704 F.Supp. 1005, 1010 (C.D. Cal. 1988) ("Plaintiff has failed to provide sufficient evidence of an advertisement campaign of an emphasis and scope sufficient to demonstrate an intent to create secondary meaning"); *DCNL, INC. v. ALMAR SALES CO.*, No. 97-CV-DLJ, 1997 U.S. Dist. LEXIS 22931, at *28-*29 (N.D. Cal. Dec. 22, 1997) ("Had the promotional activities urged consumers to, for example, 'look for the wavy vents,' such promotional activities would support an inference of secondary meaning. However, it appears that the Kurl Mi brush was promoted simply as a brush that was unusual because of its spherical shape. This does not support an inference of secondary meaning."); *see also Lisa Frank, Inc.*, 799 F.Supp. at 992 ("Advertising and promotional activities, however, must contain 'image advertising' – that is, the ads should display the trade dress itself. Otherwise, even evidence of extensive advertising or other promotional efforts would not necessarily indicate that prospective buyers would associate the trade dress with a particular source."). Here, as in those cases, the Cig2O advertising did not highlight the supposed trade dress in any particular way. Indeed, the advertising submitted in support of the motion and cited in Spark's brief shows a variety of different products bearing a host of different trade dresses – including the old 3-pack design[13] and an eye-catching black line – and prominently

---

[12]Other courts have characterized this as "look for" advertising – as in, "look for the golden arches" – meaning advertising that calls on a consumer to look for the particular feature claimed as a trade dress.

[13]*See, e.g.,* Thompson Decl., Ex. I at 043 (second and bottom shelves in the large display box on the right) & 045 (second and bottom shelves in the large display boxes next to the text reading "Grow with Cig2Go"; two small display boxes in the center next to the text reading "8 mg").

-16-

featuring the Kretek logo. *See* Thompson Decl., Ex. I. It makes no attempt to call out the claimed Cig2O trade dress at issue in this case. Also, while Spark has provided some sales information, it provides no evidence regarding the extent or location of the advertising, or the amounts actually spent promoting the Cig2O cartomizer replacement 3-pack. Given the present record, the Court would not find Spark's advertising evidence probative of secondary meaning. *See, e.g., Walker & Zanger, Inc.*, 549 F.Supp.2d at 1180; *San Francisco Mercantile Co.*, 704 F.Supp. at 1010; *DCNL, INC. v. ALMAR SALES CO.*, 1997 U.S. Dist. LEXIS 22931, at *28-*29; *Art Attacks Ink, LLC v. MGA Entm't, Inc.*, No. 04-CV-1035-B(BLMx), 2007 U.S. Dist. LEXIS 48254, at *17-*19 *aff'd*, 581 F.3d 1138 (9th Cir. 2009) (finding "insufficient evidence of 'image advertising' presented at trial to establish secondary meaning" where advertising was not focused on purported trade dress images, but instead "displayed many images, most of which were unrelated to the [trade dress] images"); *Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 685 F.Supp.2d 1001, 1014-15 *adhered to sub nom. Autodesk, Inc. v. Dassault Sys.%22es Solidworks Corp.*, 685 F.Supp.2d 1023 (N.D. Cal. 2009) ("[P]laintiff's advertising does not stress or feature the orange frame or orange frame in combination with the real element in any way that could establish secondary meaning. Plaintiff also provides examples of various of orange frames in various sizes. None of the advertising featured the consistent use of an orange frame in a manner that would support an inference of secondary meaning. Plaintiff also provides no data on how extensive the advertising was using these elements. Plaintiff merely cites to various examples of advertising without explaining how often these advertisements were used or explaining the context in which they were presented to the consuming market.").

In sum, while the evidence of intentional copying provides some support for an inference of secondary meaning, that inference is muted by Kretek's decision to prominently display an EZ Cig word mark on its packaging. The other secondary meaning evidence – sales volume, duration of exclusive use, and advertising – is mostly neutral or unfavorable to Spark. Given the procedural posture and Spark's burden to make a "clear showing that [it] is entitled to [preliminary] relief," *Winter*, 555 U.S. at 22, the Court should not find Spark has shown a likelihood of proving secondary meaning. Because Spark has not shown a likelihood of establishing that the claimed Cig2O trade dress serves a source-identifying function, and because, as discussed below, Spark has not shown a balance of hardships tipping sharply in its favor, at this stage, preliminary relief is not warranted.

### 4. Are Consumers Likely to be Confused by EZCig's Packaging?

While the prior discussion is arguably sufficient to end the matter, the Court will nonetheless analyze the remaining merits issues in case Spark displaces its tentative conclusion. Assuming Spark could meet the source-identifying function requirement, the remaining question would be whether Spark has demonstrated a likelihood of showing a likelihood of confusion. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 & n.15 (9th Cir. 1999) ("[A]t the preliminary injunction stage," the trademark owner must show "that [he] is likely to [establish] a likelihood of confusion"). The Ninth Circuit applies the *Sleekcraft* factors to determine whether two trade dresses are likely to be confused. *Vision Sports, Inc.*, 888 F.2d at 616 ("Likelihood of confusion in the trade dress context is evaluated by reference to the same factors used in the ordinary trademark context"). The *Sleekcraft* factors include: "(1) the similarity of the marks; (2) the relatedness of the two companies' services; (3) the marketing channel used; (4) the strength of [the plaintiff's] mark; (5) [the defendant's] intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of

expansion into other markets; and (8) the degree of care likely to be exercised by purchasers." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979)). As this Ninth Circuit has explained, evaluating the *Sleekcraft* factors is not meant to be a bean-counting exercise. *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998) ("The factors should not be rigidly weighed; we do not count beans"). Rather, the test "is a pliant one, in which some factors are much more important than others," *GoTo.Com, Inc.*, 202 F.3d at 1205, "and the relative importance of each individual factor will be case-specific," *Brookfield Commc'ns, Inc.*, 174 F.3d at 1054. *See also Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1031 (9th Cir. 2010) ("The *Sleekcraft* factors are not a scorecard, a bean-counter, or a checklist. Some factors are much more important than others, and the[ir] relative importance . . . will be case-specific."). In applying the factors, the "test for likelihood of confusion is whether a 'reasonably prudent consumer' in the marketplace is likely to be confused[.]" *Dreamwerks Prod. Grp.*, 142 F.3d at 1129.

### a. Is EZ Cig's Trade Dress Similar to Cig2O's?

In assessing similarity, courts must consider the trade dresses in their entirety and as they appear in the marketplace. *GoTo.com, Inc.*, 202 F.3d at 1206. Though the Ninth Circuit has said that similarities should be weighed more heavily than differences, *id.*, in essence, the "test is whether there is a likelihood of confusion resulting from the total effect of the defendant's product and package on the eye and mind of an ordinary purchaser." *First Brands Corp.*, 809 F.2d at 1383-84.

Here, the Cig2O and EZ Cig trade dress for the 3-pack cartomizer refills have undeniable similarities. As Spark points out, the packaging for both products employs: (1) a blue/white color theme, with blue areas at the top and bottom surrounding a white middle section; (2) a colored line below the top blue section depicting the flavor; (3) similar placement and orientation of items on the packaging; and (4) similarly-sized individual 3-packs and carton boxes. Viewed from the eye of a normal consumer, the total effect of Cig2O and EZ Cig's packaging shows some marked similarities.

But the packaging is also different in important ways. The most eye-grabbing feature when viewing the packaging is the colored label area. But while both products have blue labels, they are noticeably different shades. Cig2O uses a smoky, almost-tropical blue. EZ Cig uses an indigo blue, with the "EZ" mark superimposed in the background. Most importantly, the packaging for both products contains prominent word marks – 'Cig2O' and 'EZ Cig' – which immediately catch the eye.

In several cases, courts have held that the prominent placement of a distinguishing word mark or brand name on arguably similar trade dress can dispel a likelihood of confusion. *First Brands*, 809 F.2d at 1384 (affirming district court's denial of preliminary injunction based, in part, on finding that products were not likely to be confused where they looked similar but carried distinctive labels: "In fact, for the limited purpose of a preliminary injunction motion, the differences in the labels are sufficient for a finding of no likelihood of confusion") (citing with approval *Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 152 (3d Cir. 1984) (affirming denial of preliminary injunction request where "the district court found (for the limited purposes of a preliminary injunction motion) that the differences in the labels were too great to support a finding of likelihood of confusion," notwithstanding some evidence of actual confusion); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1566-71 (Fed. Cir. 1994) (collecting cases); *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1134 (Fed. Cir. 1993) (reversing judgment finding trade dress

-18-

infringement, despite finding of intentional copying, after concluding that prominent placement of distinguishing trademarks on similar trade dress dispelled likelihood of confusion: "We conclude that the conspicuous and permanent placement of the trademarks of L.A. Gear as well as the copyist, and the sophistication of purchasers of fashion athletic shoes, clearly outweigh the similarities in the shoe design, insofar as consumer confusion as to source is avoided"); *Litton Sys., Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1446 (Fed. Cir. 1984) ("The district court also failed to recognize that the most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name and that when that is done, there is no basis for a charge of unfair competition") (citations and quotations omitted); *Mattel, Inc.*, 782 F.Supp.2d at 1008-09 (Mattel's packaging . . . clearly display[s] the product names in large, prominently placed letters all around the package, including on the front of the package. The presence of these names all over the package goes far to eliminate confusion of origin. . . . [The] fact that Mattel's product names appear in large, colored lettering that can be viewed from a distance leaves no issue of material fact as to whether the trade dress is similar"); *Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1163 (C.D. Cal. 2009) ("To the extent this represents the usual placement of the logo, the presence of such a prominent tag bearing [the defendant's] logo negates a claim of confusion"); *Walter v. Mattel, Inc.*, 31 F.Supp.2d 751, 760 (C.D. Cal. 1998) *aff'd*, 210 F.3d 1108 (9th Cir. 2000) *holding modified by Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625 (9th Cir. 2005) ("Mattel's use of the words 'Pearl Beach' always appears in conjunction with its own distinctive Mattel logo and trademark, and always appears in connection with Mattel's famous Barbie trademark. Otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.") (citations and quotations omitted); *DCNL, INC.*, 1997 U.S. Dist. LEXIS 22931, at *32-33 ("In this case, the product labeling and packaging goes far beyond the 'inconspicuous labeling' found insufficient to avoid confusion"); *Skechers U.S.A., Inc. v. Vans, Inc.*, No. 07-CV-DSF(PLAx), 2007 U.S. Dist. LEXIS 88635, at *18-*19 (C.D. Cal. Nov. 20, 2007) ("All of the accused shoes contain prominent markings indicating Skechers' brand . . . . Skechers also sells its shoes in boxes that prominently display the brand . . . . It is thus unlikely that purchasers would be confused at the point of sale. Confusion between even identical marks can be avoided by the context in which the marks are presented. Plainly legible permanent brand markings can also avoid post-sale consumer confusion.") (citations omitted).[14] While there are no hard-and-fast rules in this context,

---

[14]*See also, e.g., McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 360-61 (3d Cir. 2007) ("[T]he prominent presence of another well-known word or design mark might be sufficient [to defeat a likelihood of confusion]") (collecting cases); *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) ("Based on the record before us, we find that the presence of the prominent and distinctive labels alone negates any possibility of a likelihood of confusion and provides sufficient basis for affirming the district court's grant of summary judgment"); *Versa Products Co., Inc. v. Bifold Co. (Mfg.) Ltd.*, 50 F.3d 189, 203 (3d Cir. 1995) ("[E]xcept where consumers ordinarily exercise virtually no care in selecting a particular type of product . . . clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration"); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992) ("Despite the similarity between certain aspects of the two trade dresses, when taken as a whole, including the prominently displayed names, they are not similar in any manner that is likely to cause consumer confusion"); *Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 309 (2d Cir.1972) ("The presence of [the source's] name on the product goes far to eliminate confusion of origin") (emphasis supplied); *id.* at 310

courts often consider the similarity of the trade dress, the prominence of the distinguishing mark, whether the distinguish mark is permanent or removable, and the degree of care exercised by consumers in determining whether a distinguishing logo dispels a likelihood of confusion. *See id.*

While the packaging here is no doubt similar, at least for present purposes, the permanent and prominent "EZ Cig" and "Cig2O" logos significantly diminish the similarity of the competing trade dress. *First Brands*, 809 F.2d at 1384 ("[F]or the limited purpose of a preliminary injunction motion, the differences in the labels are sufficient for a finding of no likelihood of confusion"). At this stage in the case, then, the "similarity-of-marks" factor is neutral or tilts slightly against Spark.

### b. Are the Goods Closely Related?  Do They Travel in the Same Marketing Channels?

"Consumers are more likely to be confused when 'users of similar marks or names sell related goods.'" *Rebelution, LLC v. Perez*, 732 F.Supp.2d 883, 893 (N.D. Cal. 2010) (quoting *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1536 (9th Cir. 1989)); *Brookfield Commc'ns, Inc.*, 174 F.3d at 1055 ("Related goods are generally more likely than unrelated goods to confuse the public as to the producers of the goods"). In addition, "[c]onvergent marketing channels increase the likelihood of confusion." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (citations omitted). As a result, "courts examine the proximity of the marketing channels to one another and whether direct competition exists." *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 606 (9th Cir. 1987). Ultimately, the "relatedness" and "marketing channels" factors are focused on determining whether the goods compete directly in the same market. *Sleekcraft*, 599 F.2d at 350.

Both of these factors favor Spark. The Cig2O and EZ Cig trade dresses appear on the same products intended for the same consumers. Moreover, the Cig2O and EZ Cig products use the same marketing channels and target the same customers. Blankenship Decl. ¶ 4; Milinkovich Decl. ¶ 4; Sachs Decl. ¶ 6; Zelling Decl. ¶ 3. Based on the present record, these factors clearly favor Spark.

### c. How Strong is the Cig2O Mark?

The strength of a plaintiff's trade dress depends on the interplay of two elements, the trade dress's uniqueness and the plaintiff's success in imbuing the trade dress with secondary meaning. *See Aurora World, Inc.*, 719 F.Supp.2d at 1158; *Fiji Water Co.*, 741 F.Supp.2d at 1179; *Gucci Timepieces Am. v. Yidah Watch Co.*, No. 97-CV-6985-KMW, 1998 U.S. Dist. LEXIS 15972, at *15 (C.D. Cal. Aug. 4, 1998). As discussed above, based on the current record, the Cig2O trade dress does not appear inherently distinctive or imbued with secondary meaning. Also, by including many elements in its claimed trade dress – presumably to differentiate it somehow – Spark has made the trade dress weaker. McCarthy § 8:3 ("The irony of both patent claims and definitions of trade dress is that the more elements . . . listed, the narrower and weaker the claim"). This factor favors Kretek.

### d. How Much Care Do E-Cigarette Buyers Exercise When Buying Cartomizer Replacements?

("[T]here is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed"); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 194-95 (1st Cir.1980) ("Each manufacturer displayed its name and logo prominently . . . clearly identifying [the product's] origin[, so] . . . there is hardly likelihood of confusion or palming off when the name of the manufacturer is clearly displayed").

It is generally assumed that consumers with expertise, or consumers who are buying high-cost products, exercise a greater degree of purchasing care. *Aurora World, Inc.*, 719 F.Supp.2d at 1162 (citing *Brookfield Communications, Inc.*, 174 F.3d at 1060). By contrast, when dealing with inexpensive goods, consumers are generally presumed less likely to exercise less care, thus making confusion more likely. *Id.* (citing *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1290 (C.D. Cal. 2001) (citing *Brookfield Communications*, 174 F.3d at 1060)).

In earlier cases, courts have held that cigarette buyers exhibit a low degree of care, *Lorillard Tobacco Co. v. Van Dyke Liquor Mkt., Inc.*, 471 F.Supp.2d 822, 830 (E.D. Mich. 2007), or, conversely, that they exhibit a high degree of brand-consciousness, but that, in some cases, that may actually may make them *more* susceptible to confusion, *Philip Morris Inc. v. Star Tobacco Corp.*, 879 F.Supp. 379, 388 (S.D.N.Y. 1995). Here, Spark has not presented any evidence regarding the level of care e-cigarette purchasers exercise, but asks the Court to infer a low level of care based on prior cigarette cases and the fact that cartomizer 3-packs are relatively cheap. *See* Reply at 18:18-28.

The Court would find this factor neutral. It is not clear to what extent the prior cigarette cases are relevant to the e-cigarette market, though common experience teaches that cigarette buyers have traditionally been very brand consciousness despite the product's relatively low cost. Without evidence, however, the Court is not going to speculate about the degree of care e-cigarette buyers exercise in the context of a preliminary injunction motion, particularly where the speculation is based on vague generalities. With that said, it should be noted that even for cheap goods, where consumers are typically presumed less careful, courts have found the placement of a prominent word mark likely to deter the confusion that might otherwise be expected. *Aurora World, Inc.*, 719 F.Supp.2d at 1163.

### e. Actual Confusion and Likelihood of Expansion

There is no relevant evidence of actual confusion. *Filipino Yellow Pages, Inc.*, 198 F.3d at 1152; *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995); *Norm Thompson Outfitters, Inc. v. Gen. Motors Corp.*, 448 F.2d 1293, 1297 (9th Cir. 1971); McCarthy § 15:39 ("The conclusory testimony of dealers and wholesalers as to consumer recognition is often characterized as of 'little value,' since it may be biased and does not necessarily reflect the views of the consumer class"); *id.* § 15:40 (explaining that "[c]onclusory testimony" and "affidavits from friendly employees and dealers are of little weight" in determining the probable mental reactions of consumers). Thus, the actual confusion factor weighs against Spark (although not particularly strongly since this is not a case where Spark tried and failed to gather actual confusion evidence). The likelihood of expansion factor is largely irrelevant since Cig2O and EZ Cig are already direct competitors. *Brookfield Commc'ns*, 174 F.3d at 1060 ("The likelihood of expansion in product lines factor is relatively unimportant where two companies already compete").

### f. On Balance, do the *Sleekcraft* Factors Show Likely Confusion?[15]

As discussed above, although the Cig2O and EZ Cig trade dresses exhibit similarities, the prominent, distinguishing word marks make it much less likely that consumers will be confused regarding the source of the cartomizer refill 3-packs at issue. Likewise, while the intentional copying evidence provides some support for an inference of consumer confusion, Kretek's decision to feature

---

[15]The Court incorporates its discussion of intentional copying from above. *See* Section III.A.3.b, *supra*.

-21-

a prominent EZ Cig word mark on the front of its packaging mutes this inference to a some extent. While the goods are related and travel in the same marketing channels, Spark has not yet shown the Cig2O mark to be particularly strong, and there is no current evidence of actual confusion. All of the other factors are neutral. Bearing in mind the procedural posture and Spark's burden to make a "clear showing that [it] is entitled to [preliminary] relief," *Winter*, 555 U.S. at 22, the Court would not find Spark has shown a likelihood of confusion based on the present record. As a result, even if the Court assumed that the Cig2O trade dress performed a source-identifying function, the Court would nonetheless conclude that Spark has not shown a likelihood that it will succeed on the merits.

### B. *Balance of Hardships*

While the Court would find that Spark has not shown a likelihood of success on the merits, under the Ninth Circuit's sliding-scale approach, Spark *may* still obtain a preliminary injunction by showing serious questions going to the merits and a balance of hardships tilting sharply in its favor. *Cottrell*, 632 F.3d at 1135.[16] Thus, the Court must still consider whether the balance of hardships tilts sharply in Spark's favor. If it does, the Court must go on to consider the other preliminary injunction requirements. If it does not, the Court can conclude preliminary relief is not warranted.

At the preliminary injunction stage, the balance-of-hardships question is not whether the defendant would suffer hardship by being enjoined from engaging in unlawful conduct. *Cf.* Reply at 24:7-25:4 (arguing that Kretek will not suffer any harm from the "withdrawal of an infringing product from the market"). Instead, the balance of hardships inquiry asks what kind of hardship the defendant or plaintiff will suffer if an injunction is *wrongly* issued or denied. *See* Schwarzer, Tashima, et al., Fed. Civ. Pro. Before Trial (2012) § 13:72, at 13-45 ("The real issue in this regard is the degree of harm that will be suffered by the plaintiff or the defendant if the injunction is *improperly* granted or denied"). After all, motions for preliminary injunction call for relatively-rough preliminary decisions which may later prove incorrect once all of the facts come out.

In this instance, Kretek has put forward evidence showing that it will suffer further goodwill loss and lost sales of approximately $500,000 if an injunction is issued. Gromley Decl. ¶ 23. Even if the Court were to conclude that Spark raised serious merits-related questions, at this stage,

---

[16]Although it appears that the horse has already left the barn on this point, for what it is worth, the Court also notes there is a strong argument that the *Cottrell* "sliding scale" standard is actually not the law. In *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009), the Ninth Circuit made clear that *Winter* announced the applicable standard governing injunctive relief: "To the extent that our cases have suggested a lesser standard [than that announced in Winter], they are no longer controlling, or even viable." *American Trucking*, 559 F.3d at 1052. In making that announcement, the *American Trucking* panel cited directly, as an example of "a lesser standard," to a pin-cited page of its earlier decision in *Lands Council v. Martin*, 479 F.3d 636 (9th Cir. 2007), in which it had earlier set forth both the "possibility of irreparable injury" standard that *Winter* specifically addressed and the Ninth Circuit's sliding scale approach. *See id.* at 639. It is a commonplace observation that one three-judge panel of the Ninth Circuit – such as the *Cottrell* panel – may not overrule an earlier three-judge panel – such as the *American Trucking* panel – in the absence of intervening controlling Supreme Court precedent. *See United States v. Mayer*, 560 F.3d 948, 964 (9th Cir. 2009); *see also* Schwarzer, Tashima, et al., California Practice Guide: Federal Civil Procedure Before Trial (2012) §§ 13:45.5-45.7, at 13-20.21. Nonetheless, a number of courts within the Ninth Circuit – including later Ninth Circuit decisions – have followed *Cottrell* without questioning its apparent conflict with earlier Circuit authority. *See, e.g., Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). Since the parties have not raised the issue directly, and, in any event, since this issue is ultimately one for the Circuit to resolve, the Court presumes that *Cottrell* states the appropriate standard.

considering the possible hardship to Kretek and the irreparable injury evidence Spark has put forward, the Court would find that the balance of hardships does not tilt so far in Spark's favor that it needs to consider the other preliminary injunction requirements.

## IV. <u>Conclusion</u>

For the reasons discussed above, therefore, the Court would DENY the motion.